# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3147

_____

Audio Odyssey, Ltd., an Iowa            *
Corporation, Dogan A. Dincer, and       *
Ann M. Dincer,                          *
                                        *
            Appellants,                 *   Appeal from the United States
                                        *   District Court for the Southern
        v.                              *   District of Iowa.
                                        *
United States of America and the        *
United States Small Business            *
Administration,                         *
                                        *
            Appellees.                  *

_____

Submitted: April 10, 2001
Filed: July 5, 2001

_____

Before BOWMAN and FAGG, Circuit Judges, and PIERSOL[1], District Judge.

_____

PIERSOL, District Judge.

This appeal revolves around a loan that was made by Brenton First National Bank (the Bank) to Audio Odyssey, Ltd., a retail electronics store owned by Dogan and

_____

[1]The Honorable Lawrence L. Piersol, Chief Judge, United States District Court for the District of South Dakota, sitting by designation.

Ann Dincer (Audio Odyssey and the Dincers are referred to collectively as Audio Odyssey). The loan was guaranteed by the Small Business Administration (SBA). After the Bank filed a writ of replevin and seized Audio Odyssey's inventory, Audio Odyssey brought this action against the United States and the SBA, alleging negligence, breach of contract, and tortious interference with contract. The district court granted summary judgment to the government. We affirm in part, reverse in part, and remand for further proceedings.

I

One of the policies underlying the Small Business Act states that the government should "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns." 15 U.S.C. § 631(a). The SBA helps to accomplish this, in part, through agreements to participate in loans made by private lending institutions. 15 U.S.C. § 636(a). In 1978, the SBA and the Bank signed a "Loan Guaranty Agreement" which allowed the Bank to make loans to small businesses with the SBA as the guarantor of those loans (1978 Guaranty Agreement).

In 1991, pursuant to the 1978 Guaranty Agreement, the Bank made a loan to Audio Odyssey that the SBA guaranteed. On October 3, 1991, in connection with this loan, the Dincers executed an SBA Note which stated:

> This promissory note is given to secure a loan which SBA is making or in which it is participating and, pursuant to Part 101 of the Rules and Regulations of SBA (13 C.F.R. 101.1(d)), this instrument is to be construed and (when SBA is the Holder or a party in interest) enforced in accordance with applicable Federal law.

The next day the Dincers and the SBA also executed an "Authorization and Loan Agreement." The Authorization and Loan Agreement provides that it is subject to the provisions of the 1978 Guaranty Agreement. In addition, the Authorization and Loan

Agreement requires Audio Odyssey to perform its payment obligations and keep current with all tax obligations. The loan was secured with, among other things, a security interest in Audio Odyssey's accounts receivable, contract rights, inventory, furniture, fixtures, machinery, and equipment, and a guaranty by the Dincers secured by mortgages on property they owned personally.

On July 12, 1995, John Bradley, a loan officer at the Bank, called Roger Hoffman at the SBA, who was responsible for managing the SBA's guaranteed loan program in the eastern 29 counties of Iowa. Bradley informed Hoffman that Audio Odyssey had failed to pay the loan installments for June and July, that it had fallen behind on paying its employee withholding taxes, and that it was overdrawn on its checking account. Bradley also told Hoffman that Audio Odyssey was going to hold a sale that weekend and Bradley feared that the profits would be applied to the withholding tax Audio Odyssey owed rather than to the loan from the Bank. According to Hoffman's deposition testimony, Bradley explained that the Bank representatives were going to meet with Mr. Dincer and that the Bank would give Audio Odyssey until 5:00 p.m. the next day – July 13, 1995 – to bring everything current. If that failed, the Bank was going to take possession of the collateral. Hoffman agreed.

Hoffman also received a call from Mr. Dincer on July 12, 1995. Hoffman believes the call came after he had spoken to Bradley. Mr. Dincer asked Hoffman to extend the 5:00 p.m. deadline for 30 days which would allow Audio Odyssey to become current on the loan and would give Mr. Dincer time to negotiate a payment plan with the IRS on his tax liability. Hoffman advised Mr. Dincer that he would have to discuss this workout proposal with Bradley. Mr. Dincer claims he called Bradley several times on July 13 but that his calls were not returned.

According to Mr. Dincer, on July 13 he went to the Bank with a large sum that would cover the missed June and July payments. Mr. Dincer instructed the teller to apply the funds to those loan payments. It is not clear from the record if those funds

were credited to the loan payments. On July 14, the Bank delivered a letter to Audio Odyssey at 8:50 a.m. which stated that the Bank was accelerating the loan and that the entire balance of approximately $126,000 was due in 10 minutes at 9:00 a.m. Later that day the Bank filed for and was granted a writ of replevin. According to Mr. Dincer, the Sheriff arrived with Bradley and closed down the store, taking possession of the inventory. Hoffman claims that he was not aware of the events that took place on July 13 and 14 until several days later.[2]

II

A district court's grant of summary judgment is subject to *de novo* review on appeal. Do v. Wal-Mart Stores, 162 F.3d 1010, 1012 (8th Cir. 1998); Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 65 (8th Cir. 1997).

A.    NEGLIGENCE CLAIM
      1.    Discretionary Function Exception
In its Complaint, Audio Odyssey claims the SBA, through Hoffman, was negligent because it did not follow mandatory procedures outlined in its own regulations before allowing the Bank to proceed with the liquidation. Specifically, Audio Odyssey claims that the SBA was negligent in: (1) authorizing the Bank to sue Audio Odyssey without written consent in violation of the 1978 Guaranty Agreement; (2) failing to inform the Bank that it was to take no action, including making a demand on the borrower, or file suit without written approval; (3) failing to arrange for a field visit as required by the Standard Operating Procedure Manual (SOP); (4) failing to submit the required Form 327 to obtain approval for not following the SOP; (5) failing to obtain and review a written liquidation plan from the Bank in violation of the SOP

---

[2] For an extended discussion of the facts of this case, many of which are not pertinent to the issues presented here, see this Court's opinion in a related case, Audio Odyssey, Ltd. v. Brenton First Nat'l Bank, 245 F.3d 721 (8th Cir. 2001).

and 13 C.F.R. § 120.512; (6) failing to ensure that all guarantors were notified of the acceleration of the loan; (7) failing to follow federal regulations and the SOP in general; and (8) failing to act as a "reasonable prudent lender."

Audio Odyssey's claims of negligence are governed by the Federal Tort Claims Act (FTCA). "The Federal Tort Claims Act is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813 (1976).[3] Although the FTCA generally waives sovereign immunity with respect to tort claims, its waiver does not extend to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

To determine whether an action by a government official was discretionary, we employ a two-part test defined by the Supreme Court in Berkovitz v. United States, 486 U.S. 531, 536-37 (1988). First, we must determine if the "challenged governmental action [is] the product of 'judgment or choice.'" Dykstra v. United States Bureau of Prisons, 140 F.3d 791, 795 (8th Cir. 1998) (internal citations omitted). To do this, we must determine whether the "statute, regulation, or policy mandates a specific course of action." Id. If there is a mandate there is no discretion. Second, if the government action is the product of judgment or choice, it must be "based on 'considerations of public policy.'" Id. This requires the Court to determine if the judgment is "grounded in social, economic or political policy." Id. When the policy allows government agents to exercise discretion, "'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" Id. at 795-96. This presumption may be rebutted. Id. at 796.

_____

[3] Neither party takes issue with the district court's finding that Iowa law would provide Audio Odyssey with a remedy against a private party in similar circumstances.

We agree with the district court that the decision to place a loan in liquidation is discretionary. The SOP provides "automatic" and discretionary means for placing an account in liquidation. See SOP 50 51 1 ¶ 4(a) (lists situations which will automatically place an account in liquidation); SOP 50 51 1 ¶ 4(b) (entitled "Non Automatic Situations (Judgmental)," it lists situations that will "ordinarily" trigger liquidation). The liquidation decision here was evidently based on the perceived threat to the collateral which is a "non-automatic" situation (that "ordinarily" triggers liquidation) expressly provided for in SOP 50 51 1 ¶ 4(b). See SOP 50 51 1 ¶ 4(b)(3). This does not end the inquiry, however, because once a loan is "in liquidation" the SOP provides certain mandatory steps that must be taken during the liquidation process.

According to SOP 50 51 1 ¶ 2(b)(1), the "mandatory parts of the SOP are identified through the use of the words 'shall,' 'will,' and 'must.'" Several of the steps that Audio Odyssey claims the SBA failed to take are written in mandatory language. For example, SOP 50 51 1 ¶ 44(a) states that when the guaranteed lender notifies the SBA of a delinquency or situation that may lead to liquidation, "[d]uring the conversation, the SBA spokesperson will arrange for the required field visit and advise the lender that no action, including making demand on the borrower, is to be taken without SBA's written approval." Audio Odyssey claims that Hoffman failed to inform the Bank that it was to take no action, including making a demand on the borrower, or file suit without written approval.

Similarly, Audio Odyssey claims that the SBA was negligent in authorizing the Bank to sue without written consent in violation of the 1978 Guaranty Agreement. SOP 50 51 1 ¶ 1(c) states that, while the SOP "is applicable in its entirety to all SBA participation loans," the SOP is applied within the constraints of the terms of any "Loan Guaranty Agreement" and any applicable "Rules and Regulations." In 1995, 13 C.F.R. § 120.201-1 stated that "[t]he holder of the note shall not, without the prior written consent of the other participant: . . . (d) *Sue*: Sue upon any loan instrument." The 1978 Guaranty Agreement also states that the "[h]older of the note (Lender or SBA) shall

-6-

not, without prior written consent of the other: . . . (c) accelerate the maturity of any note; (d) sue upon any Loan Instrument."

Audio Odyssey claims that the SBA failed to obtain a written liquidation plan or arrange for a field visit as mandated by the SOP. In Chapter Two entitled "Correspondence, Report and Control Systems," SOP 50 51 1 ¶ 19 states: "Upon the classification of a loan as in liquidation, a liquidation plan must be developed by the liquidation officer and approved by the line supervisor." A liquidation plan "consists of several parts, starting with a review of factual data to determine the present situation, and leading to a realistic and effective action plan for timely resolution of the debt." SOP 50 51 1 ¶ 19(a). As discussed more fully below, the SBA argues that a liquidation plan was not necessary because the Bank handled the liquidation, not the SBA. Even if the lender handles the liquidation, SOP 50 51 1 ¶ 6(b) provides that the loan will be "classified as accounts 'in liquidation' and the provisions of this SOP will apply, including the requirements for a Liquidation Plan." Similarly, after the SBA has notice of a liquidation event, SOP 50 51 1 ¶ 44(c) provides: "The borrower's premises will be visited by lender and/or SBA representative within ten working days following knowledge of any condition(s) which create(s) an 'in liquidation' situation." The language in these provisions, as defined by the SOP, is mandatory.

In concluding that the provisions of the SOP are discretionary, the SBA and the district court rely on language from SOP 50 51 1 ¶ 44 which states: "Few liquidations are the same, and, for that reason, no 'absolute' procedure can be mandated. The following steps, set forth in a 'usual' sequence, can vary as circumstances dictate." The "usual" steps include notice and a field visit. The SBA acknowledges that the provisions regarding the liquidation plan and field visit do use mandatory language but argues that the mandatory language must be read in light of the discretionary language found in paragraph 44. We agree that these mandatory provisions must be read in conjunction with the discretionary language in paragraph 44 but do not agree that the language in paragraph 44 transforms mandatory provisions into discretionary ones. The

introductory language in paragraph 44 suggests that the sequence in which these mandatory steps are taken may be altered as circumstances dictate, and therefore, "no 'absolute' procedure can be mandated." The introductory language in paragraph 44 does not mean, however, that any one of these steps need not be taken. Read in conjunction with the mandatory language elsewhere in the SOP, this one line in paragraph 44 does not negate the mandatory nature of all the other provisions in the SOP that require a liquidation plan and a field visit.

The SBA also argues that under SOP 50 51 1 ¶ 46, a liquidation plan was not necessary. SOP 50 51 1 ¶ 46 states:

> When it appears that the lender may perform as the liquidating agent on the loan, the decision to proceed on that course may be made on an event-by-event basis, or it may be for the complete liquidation. Proceeding on an event-by-event basis is usually appropriate when using a lender for specific tasks or in complex cases when events may take any of several twists. When the lender is to handle the entire liquidation, an overall liquidation plan must be approved in advance.

The SBA claims that the Bank was only authorized to perform a liquidation event – taking possession of the inventory. As a result, the SBA claims, an overall liquidation plan was not necessary. SOP 50 51 1 ¶ 43 makes clear that the SBA's decision to involve the lender in the liquidation is discretionary but paragraph 43 also states that all actions taken under that SOP "must be in conformance with applicable statutes, SBA's published Rules and Regulations, and this SOP." Thus, even if the Bank was only involved in the liquidation on an event-by-event basis, the SBA would still have to comply with SOP 50 51 1 ¶ 19, which requires a liquidation plan. The language in paragraph 46 does not negate the general requirement of a liquidation plan just because the lender may be involved in executing parts of that plan. It merely makes express the requirement that the liquidation plan be approved in advance when the lender handles the entire liquidation.

Because the SOP does prescribe a mandatory course of action for proceeding with loans in liquidation, we do not find Appley Brothers. v. United States, 164 F.3d 1164 (8th Cir. 1999) to be inapposite as the district court did. In Appley Brothers, the plaintiff claimed it was damaged as a result of the U.S.D.A.'s failure to conduct a proper investigation at the grain warehouse where the plaintiff delivered its grain. Appley Brothers, 164 F.3d at 1167-69. Appley Brothers claimed that the U.S.D.A.'s regulations required its inspector to investigate previously reported out-of-condition grain and that this investigation, which was not done, would have uncovered the problem that led to Appley Brothers's damages. Id. This Court held that the discretionary function exception did not apply because, while the U.S.D.A. inspector had discretion in how he would investigate the out-of-condition corn, he did not have the discretion to forgo the investigation altogether. Id. at 1172-73. The same is true here. As discussed below, the Bank and the SBA may have had some discretion in how they executed the mandatory requirements of the SOP, but they did not have the discretion to eliminate those steps in the liquidation process entirely. To the extent Audio Odyssey is alleging that the SBA was negligent for a complete failure to undertake certain mandatory procedures, the discretionary function exception does not apply and the district court has jurisdiction to address those claims.

The SBA is protected by the discretionary function exception, however, to the extent Audio Odyssey alleges the SBA was negligent in the way it executed these mandatory procedures. While we do not interpret SOP 50 51 1 ¶ 44 to negate the mandatory nature of certain procedures, we do agree with the district court that the language in SOP 50 51 1 ¶ 44 which states that "no 'absolute' procedure can be mandated" indicates that there is some discretion in how those mandatory procedures are executed, particularly with regard to the sequence in which they are done. Similarly, SOP 50 51 1 ¶ 44(c) mandates that a field visit is conducted but the SBA has the discretion to direct that the field visit be done by the lender, a representative of the SBA or both. Further, while a liquidation plan is mandated, neither paragraph 19 nor paragraph 46 of SOP 50 51 1, mandates that the liquidation plan be processed in any

particular way. For example, neither states that the plan must be written. Indeed, in its brief Audio Odyssey admits "[a]n action against the SBA that they reviewed a liquidation plan negligently or underestimated prior security interests, might well be barred as discretionary."

The discretionary function exception only applies to Audio Odyssey's claims of negligence in the execution of mandatory procedures if the discretion was grounded in considerations of policy. Dykstra, 140 F.3d at 795. As noted above, when a government regulation allows an employee to exercise discretion, "'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" Id. at 795-96. This presumption has not been rebutted by Audio Odyssey. As a result, the discretionary function exception bars Audio Odyssey's claims to the extent it alleges that the SBA was negligent in the manner in which it carried out mandatory procedures.

2.     Independent Contractor Exception

Under the FTCA, the United States may be sued for damages arising from the negligent or wrongful acts or omissions of "any employee of the Government." 28 U.S.C. § 1346(b)(1). Independent contractors are excluded from the definition of employees of the government. Charlima, Inc. v. United States, 873 F.2d 1078, 1080 (8th Cir. 1989). The SBA argues that the Bank was an independent contractor and that, therefore, under the FTCA, the SBA cannot be held liable for the Bank's actions. This argument was raised below but was not mentioned in the district court's opinion.

In all of the cases cited by the SBA, the plaintiffs sued the United States for the actions of the independent contractor. See Orleans, 425 U.S. at 810 (plaintiff sued government for alleged negligence of community action agency); Charlima, Inc., 873 F.2d at 1079 (plaintiff sued FAA for alleged negligence of independent, FAA approved safety inspector); Hartje v. Federal Trade Comm'n, 106 F.3d 1406, 1407-08 (8th Cir. 1997) (plaintiff sued federal government and agencies for alleged negligence of court

-10-

appointed receiver).  In none of these cases did the plaintiffs allege that the government's actions were negligent.  Rather, the plaintiffs asserted that the alleged negligent parties were federal employees in order to bring the suits against the government.  Audio Odyssey's Complaint, however, does not attempt to hold the SBA liable for the acts of the Bank.  Rather, the Complaint clearly alleges negligence on the part of the SBA itself.  As a result, Audio Odyssey's negligence claims may not be dismissed on this ground.

B.    CONTRACT CLAIM

Audio Odyssey is also suing the SBA for breach of the 1978 Guaranty Agreement.  Audio Odyssey is not a party to the 1978 Guaranty Agreement but that agreement is specifically referenced in the Authorization and Loan Agreement signed by Audio Odyssey and the SBA.  Under 28 U.S.C. § 1346(a)(2), federal district courts have original jurisdiction over any civil action based "upon any express or implied contract with the United States."[4]  The government's consent to be sued in contract generally extends only to those "with whom it has privity of contract."  See First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999) (internal citation omitted).  The exception to this rule includes those parties that are intended third-party beneficiaries of the government contract.  Id.  The district court found that Audio Odyssey was not a third party beneficiary of the 1978 Guaranty Agreement and that, therefore, the court did not have jurisdiction over the claim.

In making this determination, the district court relied on Iowa law.  Federal common law applies, however, when "a federal agency is a party to the action and . . . the outcome of the [the] case will directly affect substantial financial obligations of the United States."  Holbrook v. Pitt, 643 F.2d 1261, 1270 n. 16 (7th Cir. 1981) (citing United States v. Standard Oil Co., 332 U.S. 301 (1947); Clearfield Trust Co. v. United

---

[4]  In addition,15 U.S.C. § 634(b)(1) allows the SBA to be sued without regard to the amount in controversy.

States, 318 U.S. 363 (1943)).  Audio Odyssey is suing the United States directly on a contract to which the government is a party.  The government will be directly affected by this suit as it will determine if the United States is liable under the 1978 Guaranty Agreement.  As a result, federal common law applies to the determination of Audio Odyssey's status as a third-party beneficiary.

"The proper test for determining third-party beneficiary status is whether the contract reflects the express or implied intention of the parties to benefit the third party."  Schuerman v. United States, 30 Fed. Cl. 420, 433 (Fed. Cl. 1994).  "The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby."  Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997).  Intent may be found if the beneficiary was "reasonable in relying on the promise as manifesting an intention to confer a right on him."  Id.  If the third party was not intended to benefit from the agreement, that third party will be considered an incidental beneficiary.  Holbrook, 643 F.2d at 1270.  Incidental beneficiaries have no "legally cognizable rights under the contract." Id.

The Seventh Circuit's opinion in Holbrook is instructive.  In that case, the Department of Housing and Urban Development (HUD) was being sued by a class of tenants in housing projects in Wisconsin.  The tenants claimed they were third-party beneficiaries to contracts made between HUD and the owners of housing projects that were HUD-insured or subject to HUD mortgages.  Id. at 1269.  These contracts were made pursuant to Section 8 of the Housing and Community Development Act and they provided the terms under which HUD would disburse rent subsidies to the owners on behalf of eligible tenants.  Id. at 1268-69.  Under these Section 8 contracts, the project owners were responsible for certifying eligible tenants for HUD benefits.  Id. at 1270.  In Holbrook, several months passed after the execution of the contract upon which the named plaintiff sued before the eligible tenants were certified.  Id. at 1266.  As a result,

there is no indication that the tenants are expressly named in the contracts between HUD and the housing project owners.

To determine if the tenants were third-party beneficiaries, the Seventh Circuit looked to the underlying purpose of the contracts. The plaintiff tenants argued that the purpose of the Section 8 contracts was to provide rental assistance to low income families, while HUD claimed the contracts were meant to help financially troubled housing projects. Id. at 1271. The court rejected HUD's argument, noting that the purpose of Section 8 was to provide rent subsidies to needy families. Id. at 1271. Further, the criteria for entering into the contracts focused on the financial needs of the tenants in a particular housing project and not the financial needs of the housing project itself. Thus, the court found the contracts were made for the purpose of facilitating the goals of Section 8. Id. at 1271-74.

Neither Audio Odyssey nor any other recipient of a guaranteed loan from the Bank is expressly identified in the 1978 Guaranty Agreement. Audio Odyssey, however, is clearly part of a class intended to be benefitted by this agreement. Like the Section 8 contracts in Holbrook, the 1978 Guaranty Agreement is a vehicle for achieving the purposes underlying the Small Business Act. The declared policy of the Small Business Act states that the security and economic well-being of the nation cannot be realized "unless the actual and potential capacity of small business is encouraged and developed." 15 U.S.C. § 631(a). Thus, the purpose of the Small Business Act is to "aid, counsel, assist, and protect, insofar as possible, the interests of small-business concerns." Id.

The purpose of the 1978 Guaranty Agreement is to facilitate this goal. The 1978 Guaranty Agreement states that its purpose is to allow the Bank to "make and the SBA to guarantee loans to small business concerns pursuant to the Small Business Act." The 1978 Guaranty Agreement allows small businesses to get loans from the Bank that they might not have gotten otherwise. Although the provisions of the 1978 Guaranty

-13-

Agreement deal primarily with the terms of the relationship between the Bank and the SBA, the overriding purpose of the contract was ultimately to benefit small businesses in need of loans. Indeed, there would be no purpose for a loan guaranty agreement were it not for the mission of the Small Business Act.

In addition, there are specific provisions in the 1978 Guaranty Agreement that provide protection to the small business borrowing from the Bank. For example, under paragraph six of the 1978 Guaranty Agreement, neither of the holders of the note – the SBA and the Bank – may accelerate the maturity of the note or sue upon the note without the written approval of the other.[5] The Authorization and Loan Agreement, which was signed by Audio Odyssey and the SBA, specifically states that the Authorization is subject to the provisions of the 1978 Guaranty Agreement. As a result, we find that Audio Odyssey is a third-party beneficiary of the provisions of the 1978 Guaranty Agreement which require written approval prior to acceleration of the note or the institution of any suit upon it.

C.    TORTIOUS INTERFERENCE WITH CONTRACT

We affirm the finding of the district court that there is no jurisdiction for Audio Odyssey's claim of tortious interference with contract. It is true, as Audio Odyssey claims, that under 15 U.S.C. § 634(b)(1), the SBA may "sue or be sued," but this waiver is limited by the FTCA with regard to tort claims. "In order to place torts of 'suable' agencies . . . upon precisely the same footing as torts of 'nonsuable' agencies, . . . Congress, through the FTCA, limited the scope of sue-and-be-sued waivers . . ." FDIC v. Meyer, 510 U.S. 471, 476 (1994) (internal quotation marks omitted). Section 2679(a) of the FTCA states:

> The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against

_____

[5] These provisions are nearly identical to the SBA's regulations. 13 C.F.R. § 120.201-1 (1995).

such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

Therefore, for tort claims that may be brought under section 1346(b) against government agencies, the FTCA provides the exclusive remedy.

Claims for tortious interference of contract are cognizable under section 1346(b) because the SBA, if a private person, could be liable to Audio Odyssey under "the law of the place where the act or omission occurred" – namely Iowa. 28 U.S.C. § 1346(b); Hibbs v. K-Mart Corp., 870 F.2d 435, 439-40 (8th Cir. 1989) (citing the elements for intentional interference with contractual relations under Iowa law). Since this claim is cognizable under section 1346(b), the FTCA provides the exclusive remedy for Audio Odyssey against the SBA pursuant to section 2679. But claims for "interference with contract rights" are not within the scope of the FTCA. 28 U.S.C. § 2680(h). Therefore, Audio Odyssey has no claim for tortious interference against the SBA.

III

The judgment of the district court is reversed to the extent that it bars Audio Odyssey's claim that the SBA was negligent in failing to perform mandatory procedures and to the extent that it bars Audio Odyssey's claim for breach of contract. The judgment of the district court is affirmed in all other respects. The case is remanded to the district court for further proceedings not inconsistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-