# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1435

_____

Jessica Hinsley, personally and   *
as Guardian Ad Litem for K.M, a minor,   *
  *
  Appellants,   *
  *   Appeals from the United States
v.   *   District Court for the
  *   District of North Dakota.
Standing Rock Child Protective Services *
and the Bureau of Indian Affairs   *
  *
  Appellees.   *

_____

Submitted: November 15, 2007
Filed: February 5, 2008

_____

Before RILEY, TASHIMA,[1] and SMITH, Circuit Judges.

_____

TASHIMA, Circuit Judge.

Jessica Hinsley appeals the district court's[2] entry of summary judgment against her in a Federal Tort Claims Act ("FTCA") action. Hinsley alleges that the Standing Rock Child Protective Services ("Standing Rock CPS") negligently placed her half-

---

[1]The Honorable A. Wallace Tashima, Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

[2]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

brother in her home without warning her that he was a child molester, resulting in her brother's sexual abuse of Hinsley's daughter. The district court dismissed the action, reasoning that the challenged conduct fell within the discretionary function exception to the FTCA. We affirm the district court.

I.

Under the Indian Self-Determination and Education Assistance Act (ISDEAA), tribes and tribal organizations may enter into contracts with the federal government to assume the administration of programs formerly administered by the federal government on behalf of the tribe. *See* 25 U.S.C. § 450f(a)(1). *See generally Cohen's Handbook of Federal Indian Law* § 22.02 (Neil Jessup Newton et al. eds., 2005) (hereinafter "*Cohen*"). Such contracts are referred to as self-determination contracts. *See* 25 U.S.C. § 450b(j) (defining "self-determination contract"). *See generally Cohen* § 22.02[1] (discussing the genesis of self-determination contracts). The Standing Rock Sioux Tribe operates, pursuant to a self-determination contract, a Child Protective Services Agency charged with investigating incidents of child neglect, child abuse, and sexual abuse of children and empowered to take custody of abused children and place them with other families. *See* 25 U.S.C. § 3210(b) (providing that Indian tribes or tribal organizations can administer child protective services programs pursuant to a self-determination contract).

T.C. is a young man who has a history of sexually abusing children. As a minor, he was in the custody of South Dakota's Child Protective Services. Shortly before his eighteenth birthday, Mabel Medicine Crow, T.C.'s case worker in South Dakota, contacted James McLaughlin, an investigator for the Standing Rock CPS, and asked him to contact Jessica Hinsley, T.C.'s half sister, to see if T.C. could move in with Hinsley upon his release from South Dakota's Child Protective Services.

McLaughlin was familiar with T.C.'s history: in addition to having previously worked on T.C.'s case, he was told by Medicine Crow that T.C. had a history of sexually abusing children and had molested young girls at a foster home in South Dakota, and that, due to these actions, T.C. was removed from the foster home and placed in a group home.

Following his conversation with Medicine Crow, McLaughlin asked Hinsley,[3] a mother of three children, whether she would be willing to have T.C. live in her home.[4] Hinsley claims that McLaughlin neither told her about her brother's past abuse, nor warned her that T.C. should not be left alone with children.[5] Although she was reluctant to accept another person into her home, Hinsley allowed T.C. to move in with her.[6] Because Hinsley worked full time as a bartender, she relied upon several babysitters, including T.C., whom she allowed to be alone with her children on several

---

[3]McLaughlin was also familiar with Hinsley: earlier in his tenure with the Standing Rock CPS, he filed for custody of Hinsley, T.C., and their sister after receiving allegations that their uncle had abused them.

[4]McLaughlin claims that he drove to Hinsley's home, whereas, Hinsley, claims he telephoned her at work.

[5]McLaughlin, in contrast, contends that he told Hinsley that T.C. was a danger to small children, warning her that T.C. should not be left alone with young children.

[6]The particulars of that acceptance are also disputed by the parties. Hinsley contends that she believed that the Standing Rock CPS formally placed T.C. in her home even though, as she acknowledges, she voluntarily accepted her brother, never signed a placement agreement, never received any payments from the Standing Rock CPS, and was never again contacted by CPS. The Standing Rock CPS, on the other hand, contends that it never represented to Hinsley that a formal placement was being made and notes that the Standing Rock Sioux Tribal Court issued an order releasing T.C. from the custody of the CPS as of his eighteenth birthday.

occasions. According to Hinsley, T.C. sexually assaulted her three-year-old daughter, K.M., during these babysitting sessions.

Hinsley, personally and as guardian ad litem for K.M., brought this FTCA action against the Standing Rock CPS and the Bureau of Indian Affairs ("BIA"), alleging that the Standing Rock CPS negligently placed T.C. in her home without warning her that he was a child molester. The Standing Rock CPS moved for summary judgment, asserting that its actions were protected by the discretionary function exception of the FTCA. The district court agreed. *See Hinsley v. Standing Rock Child Protective Servs.*, 470 F. Supp. 2d 1037, 1040–43 (D.N.D. 2007). Hinsley timely appeals.

## II.

We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1135 (8th Cir. 2006). We will affirm the district court if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

## III.

It is well settled that the United States may not be sued without its consent. *See, e.g.*, *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003); *Riley v. United States*, 486 F.3d 1030, 1032 (8th Cir. 2007). The FTCA, however, waives the United States' historic defense of sovereign immunity and authorizes suits against the United States for damages

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

Congress has also consented to suit under the FTCA for "certain claims arising out of the performance of [Indian] self-determination contracts." *FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995). Tort claims against tribes, tribal organizations, or their employees, that arise out of the tribe or tribal organization carrying out a self-determination contract, are considered claims against the United States and are covered to the full extent of the FTCA. *See* Department of the Interior and Related Agencies Appropriations Act, 1991, Pub. L. No. 101-512, Title III, § 314, 104 Stat. 1915, 1959–60 (1990) (codified at 25 U.S.C. § 450f notes); *see also* 25 U.S.C. § 450f(d); 28 U.S.C. §§ 1346(b), 2671–2680; *FGS Constructors, Inc.*, 64 F.3d at 1234. *See generally* BIA Federal Tort Claims Act Coverage General Provisions, 25 C.F.R. §§ 900.180–.188 (2007); *Cohen* § 22.02[4].

The FTCA, however, includes a number of exceptions to its broad waiver of sovereign immunity—and these exceptions apply with equal force to FTCA claims brought against a tribal organization. *See* § 314, 104 Stat. at 1959–60 (codified at 25 U.S.C. § 450f notes) (describing how any tort claim brought against a tribal organization carrying out a self-determination contract will be "afforded the full protection and coverage of the Federal Tort Claims Act"). The exception relevant to this case provides that no liability shall lie for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal

agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). When an alleged act falls within the discretionary function exception, the federal court lacks subject matter jurisdiction. *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998).

The purpose of the discretionary function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1990). This "exception to the FTCA 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Dykstra*, 140 F.3d at 795 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)).

We employ a two-part test to determine whether the discretionary function exception applies. *See Riley*, 486 F.3d at 1032 (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "First, the conduct at issue must be discretionary, involving 'an element of judgment or choice,'" *id.* (quoting *Berkovitz*, 486 U.S. at 536), and not controlled by mandatory statutes or regulations, *Gaubert*, 499 U.S. at 328–29. If the employee violated a mandatory statute, regulation, or policy, the conduct does not involve an element of judgment or choice, and therefore, the conduct is not sheltered from liability under the discretionary function exception. *See Riley*, 486 F.3d at 1032. If, on the other hand, no mandate exists, the action is considered a product of judgment or choice and the first step is satisfied. *Dykstra*, 140 F.3d at 795. Under the second part of the test, we determine whether the judgment or choice was based on considerations of public policy. *Gaubert*, 499 U.S. at 325. If the challenged action was based on a judgment grounded in social, economic, or political policy, the discretionary function exception applies. *Dykstra*, 140 F.3d at 795; *see also Gaubert*,

499 U.S. at 325.[7] With that background, we turn to the applicability of the discretionary function exception to the instant case.

Hinsley bases her negligence claim on the Standing Rock CPS's failure to warn her of T.C.'s dangerous propensities.[8] We have found no statute, policy, or regulation mandating the Standing Rock CPS to warn the public or a third-party about the sexually abusive proclivities of a person who is being discharged from the CPS, nor has Hinsley alerted us to such a mandate. Therefore, the first part of the discretionary function analysis is satisfied.

With respect to the second part of the test, Hinsley urges this court to hold that the discretionary function exception is inapplicable because the strong policy interest in preventing child abuse demands that a warning be given. This argument betrays her case: it exposes the fact that the decision to warn is, at its core, a policy decision. The decision to release T.C. to his sister without a warning involves an effort to

---

[7]The individual government employee need not have consciously considered any policy factors. *C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 797–98 (8th Cir. 1993). "The judgment or decision need only be susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account, for the exception to be triggered." *Demery v. U.S. Dep't of Interior*, 357 F.3d 830, 833 (8th Cir. 2004). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion . . . , but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. In cases alleging negligent failure to warn "[i]t is also irrelevant whether the alleged failure to warn was a matter of 'deliberate choice,' or a mere oversight." *Allen v. United States*, 816 F.2d 1417, 1422 n.5 (10th Cir. 1987).

[8]Because the district court granted the government's motion for summary judgment, we view the facts in the light most favorable to Hinsley, and therefore assume that McLaughlin failed to warn Hinsley of her brother's dangerous propensities.

balance the interest in maintaining the confidentiality of T.C.'s past actions against the safety concerns that arise from placing a known sexual abuser in a home filled with children. As the district court correctly noted, "[s]uch decisions clearly implicate competing and legitimate concerns of public safety, the safety of third persons into whose homes an individual is placed, the need to maintain the confidentiality of a juvenile's records, and the juvenile's future interests upon release." *Hinsley*, 470 F. Supp. 2d at 1043. Policymakers may disagree about how those interests should be balanced, but those decisions lie with policymakers and CPS employees—the FTCA does not empower judges to second guess such decisions via tort action. *See Gaubert*, 499 U.S. at 323. We therefore conclude that the second part of the discretionary function exception test has been satisfied.

## IV.

Hinsley's allegations make out a very sympathetic case for her and her daughter. When Congress waived the government's sovereign immunity under the FTCA, however, it elected to preclude liability for administrative decisions grounded in social policy. In doing so, Congress accepted the possibility that this exemption would sometimes deliver harsh results. Because the discretionary function exception applies to the Standing Rock CPS's decision not to warn Hinsley, the judgment of the district court is

**AFFIRMED.**

_____